JAMES S. AND IDA E. FULGHAM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fulgham v. Commissioner
Docket No. 1143-71.
United States Tax Court
T.C. Memo 1976-92; 1976 Tax Ct. Memo LEXIS 309; 35 T.C.M. (CCH) 392; T.C.M. (RIA) 760092; March 24, 1976, Filed James S. Fulgham, pro se. [1]
Richard D. Hall, Jr., and Frederick T. Carney, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief *310 Judge: This case was assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. His report was filed on November 14, 1975, and subsequently the petitioners filed exceptions to his report. The exceptions have been considered and are rejected. Accordingly, the Court agrees with and adopts the report which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: This case was one of a group of 37 which were consolidated for trial, but not for opinion. At the trial, evidence was received which bears upon every case in the group. Principally such evidence relates to certain contractual arrangements between the husband-petitioners' employers (Lockheed Air Service Company and Dynalectron Corporation) and the United States Air Force, as well as the employment arrangements between field team members (such as the husband-petitioners) and such employers. Respondent determined deficiencies and an addition to tax for negligence under section 6653(a) for years and in amounts as follows: Addition Year
Deficiency
to Tax
1967
$ 128.44
1968
54.08
1969
667.08
$ 33.35
*311 No evidence was presented respecting the addition to tax under section 6653(a), and the issue as to the propriety of its imposition is deemed to have been abandoned by petitioners. The only issue for decision is whether all or any portion of the per diem payments received by petitioner James Fulgham (hereinafter, "petitioner") from Dynalectron Corporation (hereinafter, "Dynalectron") and Lockheed Air Service Company, (hereinafter, "Lockheed") should be included in his gross income for the years of their receipt, under section 61(a) of the Internal Revenue Code of 1954; [2] and, if so, whether petitioner is entitled to deduct any or all of said amounts as away-from-home traveling expenses under section 162(a)(2). FINDINGS OF FACT Petitioners, husband and wife, filed their 1967 return with the Internal Revenue Service Center which services the district of California, and their 1968 and 1969 returns with the Service Center at Chamblee, Georgia. At the time of filing their petition herein, they resided in Lauderdale County, Mississippi. During the taxable years *312 involved, petitioner was employed as a field team member by Dynalectron or by Lockheed or by both. Dynalectron and Lockheed each had a contract with the United States Air Force during such years, to provide field team services for the maintenance and modification of weapons systems (i.e., aircraft) and/or support equipment. These contracts were called "basic contracts" and the Air Force entered into such a contract with each of three different contractors. The contracts were for three years maximum duration, and those involved here were for the three fiscal years, July 1, 1967-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force insofar as both Lockheed and Dynalectron were concerned. (The record herein does not identify the third contractor who had the basic contract.) The basic contract did not, of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of *313 the contractor, if the contractor got work to be performed under the contract. The contract also contained the following provisions relating to the payment of per diem: (ii) Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative Contracting Officer, shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 miles of the work station to which the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii)(e) below). (a) In the CONUS (No quarters and messing facilities furnished by the Government)--$11.00-Per day per man for Engineer and Leadman and $9.00-Per day per man for the remainder. * * * * *
(e) For the purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the *314 location of his fixed or permanent domicile and this location, if accepted by the Contractor, shall be deemed, for the purpose of this contract, to be the employee's domicile in so far as per diem authorization against this contract is concerned. However, this does not relieve the Contractor of his responsibility to ascertain that the certification is valid. The opportunity for the contractor to perform under the basic contract arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely within the discretion of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic contract, work orders could only be issued during a given year of a basic contract. However, completion of a work order actually issued during such year might be effected after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, *315 representatives of the Air Force and of the contractor would get together at a "pre-dock" meeting where the time for completion of the contract and the make-up of the contractor's projected field team complement would be worked out. Determination of the time of performance entailed fixing an input-output schedule -- the schedule which showed the number of units coming into the contractor for its maintenance and modification services per day or week or month, and the number of units to be completed by the contractor per day or week or month. After the projected field team complement had been worked out, the contractor would then proceed to get the team together. In assembling the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. Whenever a contractor hired a new employee for field team work, that employee was advised that he was subject to being sent anywhere that the contractor might be called upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was *316 also advised that the contractor only had a basic contract for a year and that it had no way of knowing whether or when it would receive work orders under that contract. It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee after completion of the work order in connection with which he was hired, it could not guarantee any such further employment; and if none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained any pool or central area where an employee who had completed an assignment could be sent pending the contractor getting another work order on which such employee could be used. Both Lockheed and Dynalectron were involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed had first come to Meridian in 1965 and it remained there until June 30, 1969, at which time (although it did not lose its status as holder of one of the three basic contracts) it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the *317 succeeding fiscal year, Dynalectron likewise received two work orders. While in most instances, the contractor's field teams were sent to the location where the aircraft were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site from other locations. During the performance of a work order, the Air Force always had an on-site representative, monitoring the performance of the contractor. One of the areas of concern was to determine whether the field team was over strength or under strength, as well as the quality of work of the field team members. Instances occurred when the composition of the field team was changed as the result of the recommendation of the Air Force's on-site representative. For this reason, as well as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance under *318 the work order, the projected field team complement as worked out at the pre-dock meeting might vary as much as 10 to 20 percent during the performance of the contract. When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, irrespective of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed. There was no element of profit to the contractors in the per diem for which they sought reimbursement. Per diem paid to the field team employees who qualified therefor was at the rate of $11 per day for a leadman and an engineer, and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was *319 a 5-day, 40-hour week. Field team members also received per diem during their initial travel to a work site, for days of travel when transferred to different work sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. Petitioner was first hired by Dynalectron in 1962, for whom he worked until 1965. During the years 1967, 1968, and up until July 28, 1969, petitioner was employed by Lockheed. On the latter date, petitioner was rehired by Dynalectron, for which company he worked until April 1972. Petitioner's assignments with the two companies during the taxable years involved were as follows: 1967
Jan. 1 - Dec. 31 -- Meridian, Miss.
1968
Jan. 1 - Jan. 29 -- Meridian, Miss.
Jan. 29 - Aug. 2 -- Riverside, Calif.
Aug. 2 - Aug. 26 -- Spokane, Wash.
Aug. 26 - Sept. 15 -- Ogden, Utah
Sept. 15 - Nov. 7 -- Sacramento, Calif.
Nov. 7 - Dec. 31 -- Riverside, Calif.
1969
Jan. 1 - Jan. 13 -- Riverside, Calif.
Jan. 13 - Feb. 11 -- Albuquerque, N. Mexico
Feb. 11 - Dec. 31 -- Meridian, Miss.
*320 Petitioner continued in Dynalectron's employ at Meridian throughout 1970 and until March 18, 1971, when he was assigned to Hill Air Force Base in Utah. Petitioner was not advised by either Lockheed or Dynalectron as to the length of time he would remain at any of the cities to which he was assigned. Petitioner advised Lockheed and Dynalectron that his residence was 5295 Cedar Lake Road, Oscoda, Michigan. That is the residence of petitioner's mother and his stepfather, title to which is in petitioner's mother's name. Petitioner and his stepfather had erected the dwelling themselves in 1946. Petitioner keeps some household goods and a television set as the Oscoda property. Petitioner's wife accompanied him on each of his assignments during the taxable years. While on the earlier assignment to Meridian, petitioner and his wife purchased and occupied a house in that city close to Key Field. He sold this property to another Lockheed employee in early 1968, just prior to being transferred to Riverside, California. Petitioner received per diem payments of not less than $800 in 1967 and $270 in 1968 from Lockheed; and $3,500 in the aggregate in 1969 from Lockheed and from Dynalectron. *321 He did not include any amount of per diem in gross income on his return for any of the years involved. In his statutory notice of deficiency, respondent included the above-mentioned amounts in petitioner's income for 1967 and 1968, and $3,456 for 1969. He has not sought an increased deficiency for any of the years. He also determined that petitioner was liable for an addition to tax for negligence under section 6653(a). OPINION It must be determined whether the per diem payments received by petitioner from Lockheed and from Dynalectron during 1967, 1968, and 1969 are includible in his gross income for those years. It is believed that the per diem payments when received by petitioner constituted gross income. In very broad and sweeping language, section 61(a)(1) provides that "gross income means all income from whatever source derived." The Supreme Court has construed this "broad phraseology" to evince a Congressional intention "to tax all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized and over which the [petitioner had] complete dominion, *322 " ( Commissioner v. Glenshaw Glass Co.,supra, p. 431); and the Code contains no provision exempting per diem payments from taxation. Manifestly, then, the respondent was correct in including in income those amounts so determined in each of the taxable years and which petitioner received in those years. Leo C. Cockrell,38 T.C. 470, 477-478, affd. (8th Cir.) 321 F.2d 504; Darrell Spear Courtney,32 T.C. 334, 341. [4]
The question remains whether petitioner is entitled to deduct any part or all of the per diem payments under section 162(a)(2) as expenses for travel while away from home in pursuit of his trade or business as an employee of Lockheed and Dynalectron. Leo C. Cockrell,supra, p. 479. In the Cockrell case, it was pointed out that the Supreme Court, in Commissioner v. Flowers,326 U.S. 465, rehearing denied 326 U.S. 812, had laid down three requirements that a taxpayer must meet to be entitled to deduct away-from-home expenses: The expense must be reasonable and necessary traveling *323 expense; it must be incurred by the taxpayer while away from home; and it must be incurred in pursuit of business. In the present case, the parties differ only on the point of whether petitioner was away from home. In the case of Truman C. Tucker,55 T.C. 783, 786, the factors to be considered in determining whether a taxpayer should be treated as away from home for tax purposes were crystallized. It was there said: The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Ronald D. Kroll,49 T.C. 557, 562 (1968). In furtherance of this purpose, when a taxpayer with a principal place of employment goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to expect him to move his residence under such circumstances. Emil J. Michaels,53 T.C. 269 (1969); Ronald D. Kroll,supra. *324 For this purpose, temporary employment is the type which can be expected to last for only a short period of time. Beatrice H. Albert,13 T.C. 129, 131 (1949). Was petitioner's employment at each of his assignments temporary, or was it indefinite? Respondent concedes on brief that those at Riverside, Spokane, Ogden, Sacramento and Albuquerque were temporary. However, he urges that the two assignments at Meridian were indefinite. The question here is closer than it has been in some of the other cases in this group. However, on balance and considering the contractual arrangements between the contractors and the Air Force, petitioner's employment arrangements with those contractors, and petitioner's own employment history with the contractors -- all as described in the findings of fact -- it is believed that the Meridian assignments should likewise be accorded a classification of temporary. To be sure, an assignment temporary in its inception may, with the passage of time be transformed into an indefinite one, as the respondent contends. But, on this record, it is not believed that that point had been reached at either December 31, 1967, or at December 31, 1969, insofar *325 as petitioner and his Meridian assignments were concerned. However, the evidence does not establish that petitioner maintained any home of a substantial nature elsewhere than at the several places where he was assigned during 1967, 1968, and 1969. His wife accompanied him on each assignment throughout that three-year span, and at each of those places they ate, worked, and slept -- in short, made their hom. The family living expenses, which all must bear, for petitioner and Mrs. Fulgham were incurred only in those cities, and petitioner incurred none of those duplicate and additional living expenses in other localities, the burden of which the deduction afforded by section 162(a)(2) is designed to mitigate, as this Court pointed out in the Tucker case. In these circumstances, it must be concluded that Oscoda, Michigan, which petitioner claims was his home, had been abandoned as such for the purposes of section 162(a)(2) before 1967, the first taxable year here involved. His remaining ties to that community are not sufficient to qualify it as his home for the purposes of section 162(a)(2). In sum, petitioner was at, not away from, his home during 1967, 1968, and 1969 for the purposes *326 of section 162(a)(2). Accordingly, he should not be allowed any deduction under that section for any of those three years. Petitioners having abandoned the issue respecting their liability for the addition to tax for negligence in 1969, respondent's imposition of an addition to tax for that year under section 6653(a) should be sustained. * * * * *
In accordance with the foregoing, Decision will be entered for respondent.
Footnotes
1. DeQuincy V. Sutton was counsel of record for petitioners at the time of trial. Mr. Sutton died in August 1974, shortly after the last brief was filed. There is presently no counsel of record for petitioners.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. See also Fred W. Phillips,T.C. Memo. 1973-58↩.